UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL SKILL,<br><br>Plaintiff,<br><br>v.<br><br>WALTER PALAMARCHUK and MASTER BEAT, INC.,<br><br>Defendants. | Case No. 23-13206<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART SKILL'S [34, 35], PALAMARCHUK'S [37], AND MASTER BEAT, INC.'S [36] MOTIONS FOR SUMMARY JUDGMENT**

In the late 1970s, Michael Skill, Walter Palamarchuk, Jimmy Marinos, and Coz Canler formed the new-wave rock band "The Romantics" in Detroit. The band made it big in the 80s with hits like "*Talking In Your Sleep*" and "*What I Like About You*." Their work continues to appear in commercials, television,[1] and musical interpolations by contemporary artists.[2] While the band's music has endured, their friendship has not. Various lawsuits have burdened the men for decades. This is one of them.

[1] *See, e.g.*, *What I Like About You* (The WB television broadcast 2002–2006).

[2] *See, e.g.*, The Weeknd, *Secrets*, *on* Starboy (Univ. Music Grp. 2016) (interpolating *Talking In Your Sleep*); 5 Seconds of Summer, *What I Like About You (Cover)*, *on* LiveSOS (Capital Records 2014); Kriss Kross, *Da Streets Ain't Right*, *on* Young, Rich, & Dangerous (Song Music Entertainment 1996) (sampling bass line from *Talking In Your Sleep*).

This case centers around the contentious operations of the band's holding corporation, Master Beat Inc., and how the two band members that remain connected with the company—lead guitarist Skill and lead singer Palamarchuk—have treated both the corporation and one another. After a lengthy period of discovery, all parties now move for partial summary judgment. Because many basic facts of the case remain in dispute, those motions are granted in part and denied in part.

## I.

In 1984, the four original members of The Romantics—Skill, Palamarchuk, Marinos, and Canler, formed Master Beat, Inc. to hold, manage, and distribute the band's earnings. (ECF No. 34, PageID.925; ECF No. 37, PageID.2147.) The company's original shareholder agreement provided that each member of the band owned 25% of Master Beat and required the authorization of "three of the four Shareholders or Directors" for corporate actions. (ECF No.1-1, PageID.37, 38–39.) It also mandated that Master Beat "not incur any liability in excess of [2,500] dollars for any one contract or business transaction without the approval of two of the four shareholders." (*Id.* at PageID.38.) And Master Beat was also given ownership of The Romantics' trademark. (ECF No. 35-1, PageID.1286 (Sealed); ECF No 37-3, PageID.2277, 2243.)[3]

[3] Both sides submit Palamarchuk's full deposition transcript. (ECF No. 35-1, PageID.128 (Plaintiff's Sealed Exhibit A); Palamarchuk's Exhibit 4.) And they each filed bookkeeper Kathie Stork's deposition transcript. (ECF No. 35-6 (Plaintiff's Sealed Exhibit F); Palamarchuk's Exhibit 10.) Likewise, there are presently two versions of Skill's motion on the docket—one redacted (ECF No. 34) and one sealed (ECF No. 35). For efficiency, the Court cites to just one exhibit or motion throughout (but not always the same version) where there are duplicates. Relatedly, because some exhibits have been filed under seal in their entirety, and others, redacted (*see* ECF No. 48), the Court cites ECF page numbers where available and otherwise refers

As such, none of the band's individual members could perform as "The Romantics" without Master Beat's approval. (ECF No. 35-1, PageID.1254–1256 (Sealed).) Sometime around 1998, Marinos left the company. Canler did the same in 2013 after settling a lawsuit he initially filed in 2011. (ECF No. 37-5, PageID.2393–2394, 2425; ECF No. 34-25, PageID.1027–1046.) That left Skill and Palamarchuk as the sole officers and shareholders of Master Beat. (ECF No. 37-3, PageID.2198.)

In February 2011, amidst Canler's departure, Skill and Palamarchuk participated in a shareholder meeting to discuss the future of Master Beat. (*See, e.g.*, ECF No. 35-1, PageID.1175–1177 (Sealed).) There they entered a board resolution to govern the corporation and distribution of its profits among themselves. (ECF No. 35-5 (Sealed).) The resolution provided (among other things) that Master Beat would distribute royalties "'no less than' semi-annually, and intermittently whenever royalty payments in excess of $5,000 are available for allocation." (ECF No. 34, PageID.925.) Palamarchuk initially stepped up as President of the company and Skill took on the role of Secretary-Treasurer, but the pair planned to rotate roles every year. (ECF No. 37-3, PageID.2210.) That never happened.

For a time, Skill and Palamarchuk eschewed formalities provided by the resolution and worked out any action items among themselves. (*See, e.g.*, ECF No. 35-1, PageID.1166–1177 (Sealed).) They remained cordial enough to perform together. (ECF No. 37-3, PageID.2225, 2268, 2329.) Skill, who lives in Oregon, drifted

---

to the exhibits by their exhibit numbers. The Court will have a follow-up status conference with the parties to direct the unsealing of the full transcripts and allow the parties the opportunity to either redact as warranted or make them public.

away from day-to-day management of the company. (ECF No. 37-5, PageID.2470–2471.) But Palamarchuk provided Skill with regular "reports" on Master Beat's operations (ECF No. 37-3, PageID.2211–2214, 2217), and the pair made decisions about royalty distributions jointly (ECF No. 37-5, PageID.2470–2474, 2476; ECF No. 35-6, PageID.1472 (Sealed).)

At some point, however, the men fell out of harmony. They stopped effectively communicating, and when they did interact, they disagreed with each other. (ECF No. 37-3, PageID.2210, 2247 (Skill deposition ("We didn't talk much and he wouldn't return calls. . . . [W]e didn't agree on things.")); ECF No. 37-5, PageID.2437, 2464, 2479–2480 (Palamarchuk deposition).) Palamarchuk's other musical projects kept him too busy to perform with The Romantics, taking away lucrative performance opportunities from Skill who could not perform as "The Romantics" without him. (*See* ECF No. 37-3, PageID.2250–2251 ("I was out of work playing with The Romantics. . . . I was relying on Romantics' money.").)

Palamarchuk made unilateral decisions on behalf of the company, which Skill was sometimes okay with, but other times, not. (*Compare* ECF No. 37-3, PageID.2211 ("Sometimes I would—sometimes I wouldn't get involved or he wouldn't involve me and sometimes, very rarely, I was involved"), *with* ECF No. 37-3, PageID.2213 ("Wally brought in [bookkeeper] Kathie Stork, which I never agreed to").) Adding to the communication issues, Skill says Palamarchuk refused his requests for additional shareholder meetings. (ECF No. 35-1, PageID.1133–1134, 1167–1169 (Sealed); ECF No. 35-5, PageID.1391, 1397 (Sealed).) Palamarchuk says they spoke when needed

and thus meetings were not necessary. (ECF No. 35-1, PageID.1171 ("[W]e were busy at that time and we would see each other") (Sealed).) Both agree that they have not had a formal company meeting since 2011. (*See id.*)

In 2018, Master Beat's former counsel withdrew from representing the company and advised Skill and Palamarchuk to "seek mutually agreeable counsel to formalize . . . processes for cost effectively resolving professional disagreements." (ECF No. 35-4, PageID.1387 (Sealed).) He presciently warned:

> You both face a difficult situation. As 50/50 co-owners, you risk paralyzing the business. Neither of you is currently authorized to take any action on behalf of Master Beat without the express consent of the other. Even simple matters like making payments or entering into an appearance arrangement conceivably could trigger a personal liability if done without the consent of the other owner. Coordination between you is essential, and I hope that you can mutually agree on shared counsel or the engagement of separate counsels to assist you in achieving it.

(*Id.*) Given this state of affairs, Skill contemplated dissolving the company and receiving royalty payments directly. (ECF No. 37-3, PageID.2232, 2267.) But Skill says that when he floated the idea to Palamarchuk, he shut it down. (*See* ECF No. 37-3, PageID.2234–2237, 2239.)

So, as Skill tells it, he was forced to take matters into his own hands. (ECF No. 37-3, PageID.2266.) In July 2021, and despite prior counsel's admonition, Skill withdrew $20,000 from Master Beat's checking account without Palamarchuk's knowledge or authorization. (*See* ECF No. 34, PageID.929–930; ECF No. 37-12, PageID.2681.) He also reached out to several of Master Beat's partners—Sony Music Publishing, SoundExchange, and K-Tel—and asked to have royalty payments directed to him, personally, rather than through Master Beat. (ECF No. 37-3,

PageID.2237–2238.) In some cases, he was successful. Skill obtained approximately $26,700 in royalties from Sony and approximately $30,000 from K-Tel directly, without Master Beat's knowledge. (ECF No. 37-12, PageID.2681.) Skill called this "self-help to secure his royalty payments." (ECF No. 34, PageID.926.) Palamarchuk called it theft.

**Palamarchuk Sues Skill in State Court**

Thus, in August 2021, Palamarchuk and Master Beat sued Skill in state court, alleging breach of fiduciary duty, unjust enrichment, embezzlement, and concealing converted property. (ECF No. 11-7, PageID.419–421.) At the same time, Palamarchuk transferred the remaining funds from Master Beat's bank account to one of his personal accounts, referred to by the parties as the "Cash 2" account. (*See, e.g.*, ECF No. 35-1,PageID.1144–1145 (Sealed).) Palamarchuk calls this a necessary step to protect the company from further unauthorized withdrawals by Skill. Skill calls it mismanagement.

After a long and winding road of unusual events (*see* ECF No. 16, PageID.767–770 (describing state court case procedural history)), Palamarchuk and Master Beat prevailed against Skill in state court. (*See* ECF No. 11-4; ECF No. 11-9, PageID.437; ECF No. 35-7 (Sealed).) That court entered judgment in July 2022, awarding Palamarchuk and Master Beat monetary damages and removing Skill as one of Master Beat's directors, relegating him to a mere shareholder. (ECF No. 37-12, PageID.2683.)

**Skill is Removed as a Director of Master Beat**

The results of the state court litigation, says Skill, exacerbated the issues that predated the suit in several ways. First, Master Beat stopped providing Skill with the detailed financial reports he received when he was a director. (ECF No. 34, PageID.927; ECF No. 37, PageID.2153.) Although he was provided with basic profit and loss statements twice a year, he was not provided with bank statements, credit card statements, or check registers. (ECF No. 35-6, PageID.1528–1533 (Sealed).) When Skill requested more detailed financial reports and demanded inspection pursuant to Mich. Comp. Laws § 450.1487(1) (ECF No. 34-12, PageID.1007), his requests were denied because he was "no longer a director" and Defendants believed his concerns were based on "unfounded speculation." (ECF No. 34-9, PageID.983; ECF No. 34-11, PageID.1003; ECF No. 34-13, PageID.1011–1012.)

Second, there were disputes regarding the proper scope of the state court judgment. The state court entered judgment in favor of Master Beat and Palamarchuk, awarding them $77,437.26 in damages, trebled to $232,311.78 (exclusive of interests, cost, and fees). (ECF No. 34-7, PageID.977.) This amount was comprised of (1) Skill's one-time withdrawal of $20,000 from Master Beat's bank account, (2) the $26,716.20 in royalty payments that Skill received directly from Sony, and (3) the $30,721.24 in royalty payments Skill received directly from K-Tel. (*See, e.g.*, ECF No. 34-9, PageID.981.) But prior to the state court's judgment, Master Beat and Palamarchuk had already begun to recoup the money Skill diverted by garnishing his subsequent royalty payments and live performance fees. (ECF No. 34-

9, PageID.981, 983; *see also* ECF No. 35-6, PageID.1569–1570 (Sealed).) Despite mitigating their damages to the tune of over $40,000, Master Beat and Palamarchuk never disclosed these savings to the trial court and refused to credit those transactions against Skill's judgment. (*See, e.g.*, ECF No. 35-1, PageID.1228 (Sealed).) When Skill pointed this out (ECF Nos. 35-9, 35-10 (Sealed)), Master Beat and Palamarchuk responded that they were not legally obligated to offset their recovery by the amount of their mitigation. (*See id.*)

Relatedly, Skill says Defendants continued to withhold royalty distributions as provided by the 2011 board resolution.[4] Specifically, he claims that on October 3, 2022, Master Beat excluded him from a Sony royalty payment (ECF No. 34, PageID.928; ECF No. 35-6, PageID.1595–1598 (Sealed)); that "[b]etween March 2022 and May 2025," Master Beat received monthly royalties from SoundExchange that it did not distribute; and that from "May 2023 to September 2025," Master Beat received net profits from The Romantics shows that it again did not distribute. (ECF No. 34, PageID.931.) Master Beat's bookkeeper, Stork, testified that since the state court judgment, Palamarchuk alone makes decisions about when, if ever, royalty payments should be distributed. (ECF No. 35-6, PageID.1503, 1505 (Sealed).)

Despite having net profits and more than $300,000 in its account, Master Beat refused to disburse certain royalties (*id.* at PageID.1506–1507, 1540, 1630), claiming

[4] Skill also claims he was denied his fair share of royalties in July 2024 when a royalty check that would have been payable to him was lost in the mail and never credited to Defendants' judgment ledger. (ECF No. 34, PageID.929 (citing ECF No. 35-6, PageID.1600–1601 (Sealed)).)

that it needed to save money to account for legal expenses in the present case. (*See, e.g.*, *id.* at PageID.1561 (Stork deposition ("[the legal fees in this case] are unknown expenses and therefore the money stays in the account until these court cases are—this court case is resolved.")); *see also* ECF No. 35-1, PageID.1221–1222 (Sealed) (Palamarchuk acknowledging that no royalty distributions were noted on the company's 2022 profit/loss statement).) But Skill points out that Master Beat repaid a $30,000 loan Palamarchuk made to it in 1996, without interest (*id.* at PageID.1203–1207; ECF No. 35-6, PageID.1554–1557 (Sealed)), undermining the argument that its withholding of distributions was financially necessary. (ECF No. 34, PageID.933.) More fundamentally, Skill questions whether Master Beat should be covering Palamarchuk's legal fees at all. (*Id.* at PageID.932.)

Skill also says Master Beat and Palamarchuk failed to adequately protect The Romantics' intellectual property rights, identifying a live recording of a Romantics' song—*Route 66*—streaming on an unofficial Romantics Spotify page (ECF No. 34-26, PageID.1048), and some unauthorized merchandise sales, both of which he says Master Beat and Palamarchuk did not adequately address or prevent. (*See, e.g.*, ECF No. 35-1, PageID.1299–1306 (Sealed).)

To add insult to injury, Palamarchuk began performing as The Romantics with Canler—and without Skill. (*Id.* at PageID.1270–1273.) And on at least one occasion, one of Palamarchuk's solo shows was promoted on The Romantics' official website: evidence, says Skill, of a double standard, given that he was reprimanded for doing the same thing. (*Id.* at PageID.1266; ECF No. 34, PageID.934–935.)

This all culminated in the current litigation. (ECF No. 1.) Skill filed this case in December 2023 against both Palamarchuk and Master Beat, alleging that "[d]espite numerous requests for [Master Beat's Financial] information . . . [Skill] has received little to no insight into the financial records of Master Beat over the past several years." (*Id.* at PageID.1.) His complaint contains demands for accounting and inspection, claims of shareholder oppression, breach of contract and fiduciary duty, conversion, unjust enrichment, violation of his right of publicity—all under state law—and a claim of false designation under the Federal Lanham Act. These claims survived an initial motion to dismiss, although the Court narrowed Skill's demand for accounting claim to "only include information from July 18, 2022 onwards"—the date of the state court judgment. (ECF No. 16.)

After discovery, Skill, Palamarchuk, and Master Beat all move for partial summary judgment (ECF Nos. 34, 35, 36, 37). For reasons that follow, the motions are each granted in part and denied in part.

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a reasonable fact-finder to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021). In making this determination, the Court must view facts in the record, and reasonable inferences

that can be drawn from those facts, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011). "[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate." *Clair v. Zmo Homes LLC A Foreign Ltd. Liab. Co.*, No. 24-12030, 2026 U.S. Dist. LEXIS 88790, at *2 (E.D. Mich. Apr. 22, 2026) (quoting *Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Tr.*, 410 F.3d 304, 309 (6th Cir. 2005)). "Where, as here, cross-motions for summary judgment are filed, the court must 'evaluat[e] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Perry v. Curtis*, No. 25-1815, 2026 U.S. App. LEXIS 23615, at *3 (6th Cir. Aug. 5, 2026) (citing *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021)).

**III.**

The Court begins with Defendants' threshold arguments that Skill's claims include (1) improperly brought shareholder derivative claims, and (2) many that are barred by res judicata, the doctrine of unclean hands, or the *Rooker-Feldman* doctrine. (ECF No. 36, PageID.2029–2042.) *See, e.g.*, *Reid v. Thetford Twp.*, 377 F. Supp. 2d 621, 624 (E.D. Mich. 2005) (treating claim preclusion as a "threshold determination"); *Vaughn v. Taylor*, No. 21-61, 2021 U.S. Dist. LEXIS 250788, at *8–

9 (E.D. Tenn. June 15, 2021) (explaining that whether a shareholder action is direct or derivative is a standing issue).

**A.**

In general, corporate shareholders lack standing to bring "derivative" lawsuits—those brought on behalf of the corporation—to redress injuries to the corporation. *Murphy v. Inman*, 983 N.W.2d , 368–71 (Mich. 2002). A shareholder can, however, bring a "direct" lawsuit to redress his own personal injuries, or to enforce a personal right belonging to him, independent of the corporation. *Id.* at 369. To determine whether an action is "direct" or "derivative," "courts must ask (1) who suffered the alleged harm, and (2) who would receive the benefit of any remedy recovered." *Id.* at 371.

Here, the answer to both inquiries is Skill. He claims he was personally denied certain royalty distributions, cut off from the corporation's day-to-day operations and finances, and excluded from the corporation's decisions as to who gets to perform as The Romantics. *See Christner v. Anderson, Nietzke & Co., PC*, 444 N.W.2d 779, 783 (Mich. 1989) (holding that an individual action was warranted where the plaintiff shareholder's injuries were "distinct" because he was the only shareholder excluded from distributions). In other words, these are separate injured distinct to Skill, allegedly arising from his rights as a shareholder of the company, and are not derivative of any injury to Master Beat. So Skill has standing to bring this suit.

**B.**

Master Beat also asserts a res judicata defense based on the state court litigation. (ECF No. 36, PageID.2035–2042.)[5]

It is not entirely clear, however, which of Skill's claims Defendants believe are precluded. While Master Beat's brief only invokes the res judicata doctrine as to Skill's breach of fiduciary duty claim (*id.* at PageID.2035), Defendants focus their arguments primarily on Skill's claims of withheld distributions (*id.* at PageID.2036, 2038), which are the basis of Skill's *shareholder oppression* claim. But in any event, the core of Master Beat's argument is that because Skill raised Palamarchuk's wrongful refusal to distribute royalties in the state court litigation, he may not raise those same complaints again here. (*Id.* at PageID.2036.) So the Court assumes, for purposes of this analysis, that Master Beat seeks to preclude Skill from raising any claim related to the distribution or withholding of royalty funds, not just breach of fiduciary duty.

"An action is barred by res judicata when a prior action was decided on the merits, the actions involved the same parties or their privies, and the matter in the subsequent action was or could have been resolved in the first action." *Rainbow Constr., Inc. v. Howell Twp.*, No. 359353, 2023 Mich. App. LEXIS 8803, at *10 (Mich.

[5] The Court considered these arguments at length in its opinion denying Defendants' motion to dismiss filed at the outset of the case. (ECF No. 16, PageID.771–776.) There, the Court acknowledged that "if it becomes apparent [after discovery] that during the pendency of the prior state court action Skill was aware of facts and evidence that are the sole basis for his present claims," Defendants could revisit the res judicata defense. (*Id.* at PageID.776.)

Ct. App. Nov. 30, 2023) (citing *Adair v Michigan*, 680 N.W.2d 386, 396 (Mich. 2004)). Neither party disputes that the state court case involved the same parties and was decided on the merits. Thus, the only issue is whether the "same facts or evidence would sustain both actions." *Id.*

**1.**

There is no dispute that during the state court litigation the parties litigated Defendants' refusal to credit prejudgment garnishments of Skills' royalties toward the state court judgment against him. (ECF No. 42, PageID.3013.) To avoid preclusion, Skill offers that "his [shareholder] oppression claim does not rest on the legitimacy of the garnishment process in general—it rests on Defendants' failure to credit, overcollection, and non-transparency." (*Id.* at PageID.3019; *see also* ECF No. 40, PageID.2849.)

But Skill made the same argument in his state court motion for relief from judgment:

> Palamarchuk effectuated a number of withdrawals . . . from the Master Beat bank accounts to his own accounts during the pendency of this litigation (and even during the briefing on Plaintiffs' Motion for Summary Disposition), . . . clearly designed to pay him the amounts of money that Skill had previously withdrawn . . . By the time this Court was asked to rule on Plaintiffs' Motion for Summary Disposition, Plaintiffs had recovered most, if not all, of the damages they originally sought . . . .This conduct is directly at odds with blackletter law, which makes clear that a party cannot collect damages that it has already mitigated and recovered.

(*See, e.g.*, ECF No. 11-15, PageID.532.) That argument was rejected on the merits. (ECF No. 11-17, PageID.662–663.) Thus, Skill is precluded from seeking the same credit for these prejudgment garnishments in this case under the guise of a new cause

of action. *See, e.g.*, *Rainbow Constr., Inc.*, 2023 Mich. App. LEXIS 8803, at *11–12 (affirming trial court finding that plaintiff's challenges to defendant's efforts to collect on a judgment in an earlier case were precluded when plaintiff raised the issue in a subsequent lawsuit); *see also Buck v. Thomas M. Cooley L. Sch.*, 597 F.3d 812, 817 (6th Cir. 2010) ("under Michigan law, a plaintiff has a duty to supplement h[is] complaint with related factual allegations that develop 'during the pendency of' h[is] state suit or have them barred by res judicata") (citation omitted).[6]

Accordingly, the Court will narrow Skill's claims of wrongfully withheld distributions to only those instances occurring after the July 2022 state court judgment. And the Court finds that any arguments related to Defendants' failure to offset certain garnishments against that state court judgment are likewise barred.

**2.**

The remainder of Skill's claims arise from Defendants' conduct *after* Skill's removal as a director of Master Beat in July 2022. Skill claims that after his removal, he was denied shareholder meetings, excluded from performances, and kept in the dark regarding Master Beat's finances. (*See* ECF No. 37-19, PageID.2748–2749 (list of performances since January 2022); ECF No. 35-1, PageID.1147–1148 (Sealed).) Defendants admit that at least some of the cash transfers between the Master Beat

[6] In a footnote, Skill concedes that he raised these arguments in state court, but maintains that the claims are different because the prior motions "directly challenge[d]" the state court judgment. (ECF No. 40, PageID.2850 n.4.) But the type of relief he sought there makes no difference: the factual bases for both that claim, and this one, are the same. That is the relevant inquiry—not how the motion was styled.

account and the Cash 2 account occurred after the entry of the state court judgment. (*See* ECF No. 34-29, PageID.1069 (interrogatory response noting a September 30, 2022, transfer of $28,000 of Master Beat funds from Cash 2 back to the Master Beat Chase checking account).) Skill also points to incidents of full or partial withholding of royalty distributions spanning from October 2022 to May 2025, which necessarily postdate the July 2022 state court judgment. (ECF No. 34, PageID.931–932).[7] Because these claims could not have been brought in the state court litigation, they are not precluded by res judicata. *See Buck*, 597 F.3d 812 (explaining that "facts that had not occurred at the time that [plaintiff] has filed her state court complaint" are not precluded); *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 304 (6th Cir. 2011) (it is a "well-settled principle that res judicata 'cannot be used to cut off a cause of action before it accrues'" (emphasis original) (citation omitted)).

Master Beat pushes back. It argues that even if some of Skill's claims "transpired after and are not part of the same transaction as the state court action," they nevertheless "fall within the broad transactional test and must be dismissed." (ECF No. 36, PageID.2039.) Not so.

The referenced "transactional test" provides that multiple *theories* of relief may constitute a single cause of action if "a single group of operative facts give rise to the assertion of relief." *Adair*, 680 N.W.2d at 987–98. Said another way, a losing plaintiff cannot evade res judicata by simply re-packaging their unsuccessful claim under a

[7] Skill adds that because he has not received a complete accounting of Master Beat's financials, he cannot determine the exact amount of money Defendants are supposedly withholding. (ECF No. 42, PageID.3007–3008.)

different legal theory. "The proper test is 'whether the facts are related in time, space, origin or motivation, [and] whether they form a convenient trial unit . . . .'" *Marketplace of Rochester Hills Parcel B, LLC v. Comerica Bank*, 871 N.W.2d 710, 710 (Mich. 2015) (quoting *Adair*, 680 N.W.2d at 398).

That is not what happened here. Skill's surviving claims turn not on new *theories*, but new *facts* since the state court decision. In the wake of his removal as a director, Skill alleges new acts of self-dealing and mismanagement by Defendants that injured him as a shareholder, including additional withholding of distributions, refusal to host shareholder meetings, non-disclosure of Palamarchuk's Cash 2 account, and excluding him from touring. (ECF No. 34, PageID.943.) As these are acts that had "not yet occurred" when the July 2022 state court judgment was entered, Master Beat is not entitled to summary judgment on its argument that Skill's shareholder oppression and breach of fiduciary claims are barred by res judicata. *See Kennedy v. Benson*, No. 24-1799, 2024 U.S. App. LEXIS 24584, at *12 (6th Cir. Sept. 27, 2024).

**C.**

Next, Defendants argue that Skill should be estopped from asserting claims in equity by the doctrine of unclean hands. (ECF No. 36, PageID.2034.) Such equitable claims include breach of fiduciary duty, shareholder oppression, and unjust enrichment. *See Karpiuk v. Myers*, No. 266570, 2006 Mich. App. LEXIS 2463, at *12 (Mich. Ct. App. Aug. 8, 2006) ("Plaintiffs' claims of breach of fiduciary duty call on

the equitable powers of this Court."); *Madugula v. Taub*, 853 N.W.2d 75, 89 (Mich. 2014); *Tkachik v. Mandeville*, 790 N.W.2d 260, 566 (Mich. 2010).

"A party seeking equity must have 'clean hands,' meaning equity will not aid a party who has acted in bad faith or inequitably, irrespective of the other party's improprieties." *Karpiuk*, 2006 Mich. App. LEXIS 2463, at *12 (citing *Rose v. Nat'l Auction Grp., Inc.*, 646 N.W.2d 455, 460–61 (Mich. 2002)). The doctrine is not a vehicle for courts to generally evaluate the moral character of the parties appearing before them. *Id.* at 12–13 (citation omitted). Rather, the doctrine should only be invoked where the alleged misconduct "bear[s] a more or less direct relation to the transaction concerning which complaint is made." *Id.* (citation omitted). "[T]he primary [question] . . . is whether the plaintiffs sought to mislead or deceive the other party[,] not whether that party relied upon plaintiffs' misrepresentations." *Stachnik v. Winkel*, 230 N.W.2d 529, 535–36 (Mich. 1975).

"Unclean hands may be found even if the party's misconduct does not rise to the level of a criminal or tortious act." *Ecker v. Nickel (In re Ecker Trust)*, No. 372683, 2025 Mich. App. LEXIS 6405, at *15 (Mich. Ct. App. Aug. 12, 2025). But "willful" conduct that "transgresses equitable standards of conduct" is a high bar. *Id.*; *see also Stachnik*, 230 N.W.2d at 534–35 (finding unclean hands where plaintiffs "intentionally misrepresented themselves as agents of [a] timber company" to acquire property from an elderly couple); *Karpiuk*, 2006 Mich. App. LEXIS 2463, at *4 (finding unclean hands where plaintiff made fraudulent representations on U.S. customs declarations and pled guilty to a misdemeanor for bringing merchandise into

the U.S. by presenting false documents); *Citizens United Against Corrupt Gov't v. Johnson*, No. 14-12795, 2015 U.S. Dist. LEXIS 728, at *3 (E.D. Mich. Jan. 5, 2015) (finding unclean hands where plaintiff was convicted of embezzling funds from a public school while serving as elected school board member).

Whether Skill's withdrawal of funds from the Master Beat account when he was a director constituted "blatant theft" that "transgresses equitable standards of conduct" (ECF No. 36, PageID.2035), or was "self-help" necessitated by Palamarchuk's self-dealing, is in dispute, notwithstanding the state court finding that an unauthorized withdrawal and diversion occurred. (ECF No. 11-9, PageID.442.) And the record remains mixed as to whether Skill's actions were done with an intent to "mislead or deceive" Defendants. *See Stachnik*, 230 N.W.2d at 535–36. Skill apparently made no attempt to conceal his withdrawals and testified that he believed the money to be rightfully his. (*See* ECF No. 37-3, PageID.2262–2263, 2283, 2284–2285, 2294, 2310, 2311 ("I felt it was appropriate"); *id.* at 2317 ("I took my own money. . . . That's what I thought we were owed.").) Thus, summary judgment is not warranted on Defendants' unclean hands defense.

**D.**

Finally, Defendants also raise the *Rooker-Feldman* doctrine as a bar to Skill's claims. (ECF No. 36, PageID.2039–2042.) That doctrine prevents state court losers from "complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280,

284 (2005). This is an "'exceedingly narrow' jurisdictional bar, applying only if a party seeks to undo a state-court judgment." *Lundeen v. Wells Fargo Bank, N.A.*, No. 24-3193, 2024 U.S. App. LEXIS 24402, at *2–3 (6th Cir. Sept. 25, 2024) (quoting *Hohenberg v. Shelby County*, 68 F.4th 336, 340–41 (6th Cir. 2023)).

The *Rooker-Feldman* argument is based on Skill's challenge to Defendants' failure to credit prejudgment garnishments of Skill's distributions against his ultimate judgment amount. For the reasons stated above, however, this argument is precluded by res judicata and thus Defendants need not resort to *Rooker-Feldman*. Nor does it apply. Skill does not challenge the state court judgment itself, nor Defendants' power to garnish his royalties to collect on it. (ECF No. 42, PageID.3019.) He only challenges Defendants refusal to "credit" the amounts they "had already received . . . attributable to this debt." (ECF No. 40, PageID.2848–2849.) In a way, this is an effort to enforce, rather than undermine, the judgment. Accordingly, Defendants' motion is denied in this respect as well.

## IV. Cross Motions

Having addressed Defendants' affirmative defenses, the Court turns to the merits of the contested claims. Master Beat and Skill both move for summary judgment on Skill's claims for an accounting and inspection of corporate financial records. Master Beat, Skill, and Palamarchuk all move for summary judgment on Skill's shareholder oppression and breach of fiduciary duty claims. As those are really the heart of the case, the Court starts there.

### A. Shareholder Oppression

Generally, courts hesitate before interfering with the business decisions made by a corporation's officers. *Smith v. Smith*, No. 19-10330, 2020 U.S. Dist. LEXIS 81240, at *23–24 (E.D. Mich. May 8, 2020). This rule—the business judgment rule—prevents courts from meddling in a corporation's affairs "unless it is clear that the directors have engaged in fraud or misappropriation, or 'refuse to declare dividends [when financially possible].'" *See id.* (citation omitted). But that does not mean directors' decisions are wholly immune from review. Michigan law authorizes an action by a shareholder where the director of a corporation engages in "illegal, fraudulent, or willfully unfair and oppressive [acts] to the corporation or to the shareholder." Mich. Comp. Laws § 450.1489(1).

"Willfully unfair and oppressive conduct" is defined as "a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder." *Id.* § 450.1489(3). Conduct that is permitted by contract or agreement—like the corporation's bylaws or "consistently applied written corporate policy"—cannot give rise to a shareholder action. *Id.* But *breach* of such an agreement, might. *Turner v. J & J Slavik, Inc.*, No. 370564, 2026 Mich. App. LEXIS 4964, at *23 (Mich. Ct. App. June 12, 2026) ("breach of the rights and interests contained in the stockholders' agreement could be evidence of shareholder oppression").

Skill identifies four acts by Defendants that he says constitute willful and oppressive conduct: (1) failing to issue royalty distributions in accordance with the

2011 board resolution and, relatedly, mismanaging Master Beat's finances by repaying Palamarchuk's decades-old loan while refusing to make shareholder distributions; (2) transferring Master Beat funds to the Cash 2 account; (3) refusing to hold shareholder meetings; and (4) permitting Palamarchuk to tour as The Romantics without Skill. (ECF No. 34, PageID.942; ECF No. 42, PageID.3015.) Defendants say none of these acts—together or separately—meet the standard of "willfully unfair and oppressive conduct." The Court addresses them in turn.

**1.**

Start with Skill's first theory of shareholder oppression—that Defendants willfully breached his rights by violating the 2011 board resolution and refusing to dispense royalties. (ECF No. 34, PageID.942.) Defendants do not dispute that Skill (and Palamarchuk, too), have gone without distributions for some time. Rather, they argue that their decision to withhold distributions was reasonably made to protect the company's finances, given its various legal entanglements in recent years and related costs.

Shareholders' rights include receiving corporate dividends. *George S. Hofmeister Family Trust v. FGH Indus., LLC*, No. 06-1398, 2007 U.S. Dist. LEXIS 26919, at *14 (E.D. Mich. Apr. 12, 2007). As such, "[r]efusal to declare dividends can be considered willfully unfair and oppressive conduct under § 450.1489." *Blankenship v. Superior Controls, Inc.*, 135 F. Supp. 3d 608, 619 (E.D. Mich. 2015) (citations omitted). But a corporation's refusal to declare dividends where the company had the financial means to do so does not, by itself, constitute shareholder oppression. *MJC*

*Ventures LLC v. Detroit Trading Co.*, No. 19-13707, 2021 U.S. Dist. LEXIS 62099, at *19–20 (E.D. Mich. Mar. 30, 2021) (citing *Blankenship*, 135 F. Supp. 3d at 608). Rather, the suing shareholder must establish that the reason for that refusal was "a fraudulent decision or a decision made in bad faith." *Id.*; *see also Wolding v. Clark*, 563 F. App'x 444, 453 (6th Cir. 2014) ("[I]n the absence of bad faith or fraud, courts will not interfere with the discretion of the directors in deciding whether to declare a dividend."). Thus, "the business-judgment rule does not prohibit a court from reviewing the totality of the evidence when evaluating defendants' business decisions—including their dividend policy." *Franks v. Franks*, 944 N.W.2d 388, 405 (Mich. Ct. App. Sept. 24, 2019).

Reviewing the totality of evidence here, the Court finds a fact issue as to whether Defendants' decision to "suspen[d] . . . virtually all distributions to Skill" (ECF No. 42, PageID.3015), from July 2022[8]–May 2025 (ECF No. 34, PageID.931), was made in bad faith. For one thing, this directly contravened the parties' signed 2011 board resolution, which provided for "no less than" semi-annual distributions "whenever royalty payments in excess of $5,000 are available for allocation." (*Id.* at PageID.925 (citing ECF No. 35-3 (Sealed).) While Palamarchuk contests the extent to which that agreement was enforced, he does not dispute that it was reached and has not been superseded by any other agreement. (ECF No. 35-1, PageID.1183 (Sealed).)

[8] Recall that this is the date of the state court judgment. Skill claims that his royalties were withheld even earlier than this, but the Court found those claims, which predated the state court action, were barred by res judicata.

For another, Skill points out that the company had plenty of money. Defendants have put forward some evidence that Master Beat has an established policy of maintaining some savings in reserve such that its "surplus" funds were not, in fact, a "surplus" available for distribution. And Skill has put forward evidence undermining this purported saving-up rationale. Namely, the company's decision to repay a $30,337 loan that Palamarchuk made to it nearly 30 years ago. (*Id.* at PageID.1204–1207 (Sealed); ECF No. 35-24 (Sealed).) A reasonable jury could find that if Master Beat was as cash-strapped as Defendants claim, Palamarchuk could stand to wait a little longer before recouping his decades-old loan. *See, e.g.*, *Franks*, 944 N.W.2d at 405 (finding that defendants "causing" a corporation to "withhold[] the payment of dividends" in a matter inconsistent with "its historical practice . . . could be indicative of shareholder oppression").

In this respect, both Skill's and Palamarchuk's motions for summary judgment on the shareholder oppression count (Count III) are denied.

**2.**

At some point during the pendency of the state court litigation, Palamarchuk established an account outside of the main Master Beat account into which he deposited Master Beat funds. This was referred to as the "Cash 2" account. Skill challenges Defendants' use of the "Cash 2" account to secretly transfer Master Beat's funds into Palamarchuk's hands alone. Such an action plainly interferes with Skill's shareholder right to "examin[e] the corporate books" and records. *George S. Hofmeister Family Trust*, 2007 U.S. Dist. LEXIS 26919, at *14 (citing *Franchino v.*

*Franchino*, 687 N.W.2d 620, 628 (Mich. Ct. App. 2004)); *see also Joseph*, 2022 U.S. App. LEXIS 23212, at *16 (noting that "cases recognize broad shareholder rights to corporate records"). But was it done in bad faith?

Here again, there is a genuine fact dispute as to whether Palamarchuk was justified in taking this drastic step to "protect" Master Beat. Palamarchuk says he temporarily transferred the funds "for the sole and temporary purpose of protecting Master Beat funds from conversion by Skill." (ECF No. 39, PageID.2785.) Skill says the transfer had nothing to do with protection and instead was aimed at "concealment and unilateral control." (ECF No. 42, PageID.3017.) A jury will have to decide who to believe. *See Franks*, 944 N.W.2d at 404 ("defendants could establish a question of fact . . . by proffering evidence . . . [that] though the actions may have substantially interfered with the shareholder's interests as a shareholder, [they] were nevertheless done for a legitimate business reason"); *see also Turner*, 2026 Mich. App. LEXIS 4964, at *4 (affirming lower court's denial of summary judgment for defendants where there was "deposition testimony that defendants . . . refused [plaintiff's] solicitations for pertinent company documents").

**3.**

The same goes for Skill's claims of shareholder oppression arising from the lack of shareholder meetings. The law is clear that shareholders have a right to vote at shareholder meetings. *Arevelo v. Arevalo*, Nos. 285548/286742, 2010 Mich. App. LEXIS 597, at *16–17 (Mich. Ct. App. Apr. 6, 2010) (recognizing shareholders' rights to vote at meetings). It follows that such a right is disturbed if shareholder meetings

are never held. In an interrogatory response, Palamarchuk conceded that a "formal meeting" has not happened since at least 2020. (ECF No. 37-19, PageID.2754 (claiming that around 2020, Skill told Palamarchuk to stop contacting him and acknowledging there's been no "formal meeting" since).)

Nevertheless, Defendants contend that the parties were still communicating and working out issues as they arose. (*Id.* ("Despite the absence of a formal meeting, due to Plaintiff's refusal to speak with Palamarchuk [about business matters], Plaintiff has been provided with relevant information, Master Beat has run without interruption or problem, and Master Beat has been fully able to continue its operations without detriment."); ECF No. 35-1, PageID.1166 ("We were seeing a lot of each other at that point still from doing shows together. If we needed to talk about anything, we talked about it, we discussed it.") (Sealed).) Skill says otherwise. (ECF No. 37-3, PageID.2248, 2225.) In fact, he points out that Master Beat's former counsel previously recommended the men implement a "reasonable dispute resolution protocol" lest they paralyze the corporation, but Palamarchuk never followed this advice. (ECF No. 34, PageID.942; ECF No. 35-4, PageID.1387 (Sealed).)

Accordingly, whether the lack of shareholder meetings was a product of ordinary scheduling conflicts, or lack of need, or Palamarchuk's bad-faith desire to consolidate his control of Master Beat, is contested. This genuine dispute of material fact precludes summary judgment.

**4.**

Skill says Defendants have also deprived him of his shareholder rights by unilaterally deciding Palamarchuk may tour as "The Romantics" without Skill and refusing to share the proceeds of those performances with him. (ECF No. 34, PageID.942.) Recall that Master Beat controls the band's trademark and is thus the entity with authority to authorize performances of "The Romantics." (*See, e.g.*, ECF No. 36-5, PageID.2083.) Skill's present argument, as the Court understands it, is not that Palamarchuk has improperly promoted his independent performances as "The Romantics." Rather, he takes issue with the fact that Palamarchuk and Canler have performed as The Romantics, with Master Beat's permission, *without* Skill, and without sharing the performance fees and the proceeds from those performances with him. (ECF No. 35, PageID.19; ECF No. 42, PageID.3015.) Indeed, Skill maintains that Palamarchuk's decision to tour without him was a departure from over 30 years of practice. (ECF No. 42, PageID.3015.)

But Defendants' decision to exclude Skill from performances is not *shareholder* oppression. In other words, Skill's position as a shareholder does not entitle him to perform under The Romantics moniker or to receive performance fees. Nothing before the Court suggests that Palamarchuk performing without Skill was prohibited by the shareholder agreement, the 2011 board resolution, or any other corporate policy. Thus, an inability to tour with the band and earn performance fees are not damages that Skill suffered in his capacity as a shareholder. And § 450.1489 "only gives rise

to a cause of action where a shareholder suffered oppression in his or her capacity as a shareholder." *Wolding*, 563 F. App'x at 451.

However, to the extent Palamarchuk and Canler's performances as The Romantics generated profits for Master Beat, and resulting distributions were not paid to Skill, this would be a legitimate part of his shareholder oppression claim involving his right to receive distributions. Palamarchuk testified that apart from individual performance fees, any revenues made from the performances would be distributed to shareholders or used to pay bills. (*See* ECF No. 35-1, PageID.1156–1157 (Sealed); *see also* ECF No. 35-22 (showing net performance profits remaining after costs and fees paid out) (Sealed).) Skill says he was excluded from distributions of these performance profits. (ECF No. 34, PageID.933–934, 946.) So to the extent Skill was cut out from his share of those profits, Defendants offer no explanation why that exclusion was justified by the business judgment rule.

For these reasons, Palamarchuk's motion for summary judgment on Skill's shareholder oppression claim (Count III) is denied.

**B. Breach of Fiduciary Duty**

Next, Skill asserts that Palamarchuk, as the sole director of Master Beat, breached his common-law fiduciary duties to Skill.

"[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one upon the judgment and advice of another." *Vicencio v. Ramirez*, 536 N.W.2d 280, 284 (Mich. Ct. App. 1995). "In Michigan, directors and officers of corporations owe fiduciary duties and a strict duty of good faith to the

corporation they serve, as well as directly to their shareholders." *Turner*, 2026 Mich. App. LEXIS 4964, at *26 (citing *Murphy*, 983 N.W.2d at 357). To establish a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages caused by the breach of duty. *Highfield Beach at Lake Michigan v. Sanderson*, 954 N.W.2d 231, 247 (Mich. Ct. App. 2020); *see also Fisher v. Perron*, 30 F.4th 289, 299 (6th Cir. 2022) (same elements). There is no dispute that Palamarchuk, a director of Master Beat, owed Skill, a shareholder of Master Beat, a fiduciary duty. *Murphy*, 983 N.W.2d at 361. But the parties dispute whether Palamarchuk breached that duty.

What constitutes breach can be "amorphous" and depends "heavily upon context." *See id.* at 362–63. At bottom, directors must act with "due care, with loyalty, and in good faith," and "exercise candor toward the corporation's shareholders." *Id.* at 362. This includes an obligation to "disclose all material facts within [a director's] knowledge that may influence shareholder action." *Id.* at 362–63. "[B]ecause the shareholders participate in the management of the corporation, the relationship among those in control of a closely held corporation requires a higher standard of fiduciary responsibility, a standard more akin to partnership law." *Estes v. Idea Eng'g & Fabrications, Inc.*, 649 N.W.2d 84, 91 (Mich. Ct. App. 2002); *see also Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 436 (6th Cir. 2026) (adopting these principles from *Murphy* and *Estes*).

Skill argues that Palamarchuk breached his fiduciary duty in essentially four ways: (1) failing to provide financial transparency regarding Master Beat's

operations, including use of the Cash 2 account (ECF No. 34, PageID.943–945); (2) indemnifying Palamarchuk's personal legal fees in this case and the state case (*id.*); (3) excluding Skill from "The Romantics" shows (*id.*); and (4) failing to adequately protect the band's intellectual property (*id.* at PageID.946–947). Only the first theory hits the right note.

**1.**

It is undisputed that after Skill was removed as a director, the financial reporting Master Beat provided him changed. (ECF No. 35-6, PageID.1510–1512, 1523 (Sealed).) Master Beat's funds were transferred to an account Skill had no access to or information about—the Cash 2 account. Stork stopped delivering detailed financial reports to the company's two shareholders (Skill and Palamarchuk) and lone director (Palamarchuk), because Palamarchuk had direct access to the company's bank accounts and thus did not need reports. (*Id.*) As for Skill, Stork produced only generic profit/loss statements. (*See id.*) Skill asked for more detailed reports (ECF Nos. 35-9, 35-10 (Sealed)), but Defendants responded that Skill, as a shareholder, was not entitled to them. (ECF No. 35-11 (Sealed)).

True, once Skill lost his officer position and had only shareholder status, his right to Master Beat's financial records was correspondingly less. But even as a shareholder, Skill is entitled to all "material facts within [Defendants'] knowledge that may influence shareholder action." *Murphy*, 983 N.W.2d at 363–63. And Skill says Defendants' refusal to provide him with *any* financial records associated with the Cash 2 account impeded his ability to understand how decisions regarding costs

and royalty distributions were being made, "depriving him of the information necessary to protect his ownership interest." (ECF No. 34, PageID.943–944.) This strikes at the "essence" of a director's fiduciary duty—"to 'produce to each [shareholder] the best possible return'" on his investments. *Murphy*, 983 N.W.2d at 363 (citation omitted).

So the fundamental issue here is not whether Skill was denied access to some material information, he was, but whether that denial was done in bad faith. Recall that the business judgment rule prohibits courts from meddling with a director's business decisions unless the director is "guilty of willful abuse of [his] discretionary powers' or act[s] in bad faith.'" *Ventimiglia v. Mancini*, No. 357458, 2022 Mich. App. LEXIS 6332, at *10 (Mich. Ct. App. Oct. 20, 2022); *see also id.* at *12 (noting that "the business-judgment rule is applicable to [a] plaintiff's claim for breach of common-law fiduciary duties"). Once again, the parties provide contrary positions. Palamarchuk says he did not direct more thorough financial disclosures because they were not necessary. Skill says the obscurity was to conceal Palamarchuk's bad dealing. This is a genuine dispute of material fact that a jury needs to resolve. Both parties' motions for summary judgment are therefore denied as to this claim (Count IV).

**2.**

Skill additionally contends that it is improper for Master Beat to cover Palamarchuk's legal fees here and in state court. (ECF No. 34, PageID.944.)

Michigan law gives corporations the power to indemnify their directors' personal legal costs and fees provided those fees were incurred in connection with

their corporate roles and they acted in good faith. *See* Mich. Comp. Laws § 450.1561. Corporations, however, must follow the approval procedures outlined in Michigan Comp. Laws § 450.1564a, which, in relevant part, provide that a corporation may decide to indemnify based on a "written opinion by independent legal counsel." *Id.* § 450.1564a(1)(c). Palamarchuk sought and received indemnification of his fees pursuant to these statutory provisions. (ECF No. 39-3, PageID.2805 (September 2022 legal fees letter); ECF No. 39-5 (May 9, 2025, legal fees letter).)

But Skill still challenges that decision. He points out that the attorney who authored the letter approving Palamarchuk's indemnification was Master Beat's retained attorney, Joshua Arnkoff. And he says that is not "independent legal counsel." Relying on Ohio law and a 1983 New York state court case, Skill says the corporation's counsel cannot independently assess indemnification. (ECF No. 44, PageID.3095 n.8.); *see also Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 162 (N.Y. App. 1983) ("In the end, the concern is basically to guard against counsel passing judgment upon his own acts. We thus hold that 'independent legal counsel' under section 724 of the Business Corporation Law is an attorney who is free from past connections with the corporation or the persons to be indemnified.") Skill makes a good point. Unfortunately, the term "independent legal counsel" is not statutorily defined, and the Court has found no Michigan case construing it. Nor have the parties provided one.

But the record here does not support that corporate counsel was passing judgment on his own acts—which appears to be the intended purpose of

§ 450.1564a(1)(c).[9] Arnkoff is counsel for Master Beat alone—not Palamarchuk. He is employed by a different firm than Palamarchuk's counsel. And Skill provides no evidence that Arnkoff acted against Master Beat's best interests by authorizing the corporation to indemnify Palamarchuk or why he could not be trusted to fairly evaluate whether his client should pay a director's legal fees. Accordingly, Defendants are entitled to summary judgment on Skill's breach of fiduciary claim arising from Master Beat's indemnification of Palamarchuk's legal fees.

**3.**

Third, Skill challenges Palamarchuk's decision to perform as The Romantics without him. He contends that Palamarchuk has "leverage[ed] his position as the company's sole officer to suppress Skill's professional opportunity and to monopolize the commercial value of the band's branch for his own benefit." (ECF No. 34, PageID.946.) As noted above (*infra* IV.(A)(4)), to the extent Palamarchuk has denied Skill his share of the *profits* obtained from The Romantics' performances, (ECF No. 34, PageID.946), this may constitute a breach of his fiduciary duty to Skill as a shareholder.

---

[9] The statute itself lends support to this reading. The subdivisions of Mich. Comp. Laws § 450.1564a list a few ways a corporation may approve indemnification. Other than section (1)(c), they all involve a vote by the corporation's directors, board, or shareholders who are not implicated in the subject lawsuit. In this regard, the statute's chief concern appears to be preventing the person seeking indemnification from deciding the issue. So in context, the Court finds that "independent legal counsel" can include the corporation's retained attorney, as opposed to an attorney for the implicated board member, officer, or shareholder.

But again, Skill offers no evidence or case law to support his claim that Palamarchuk breached any fiduciary duty owed to Skill by excluding him from performances and corresponding individual performance fees. Any injury Skill claims to have suffered from being excluded these performances derives from his status as former touring member of the band—not his status as a shareholder. Said another way, Palamarchuk owes Skill a fiduciary duty vis-à-vis Master Beat. *See, e.g.*, *Murhpy*, 983 N.W.2d at 362–63 (explaining that the fiduciary duty a director owes a shareholder derives from the purpose of the corporation, i.e., "[a] business corporation is organized and carried on primarily for the profit of the [share]holders. The powers of the directors are to be employed for that end") (citation omitted). Authorizing performances that generate profits for Master Beat does not harm that interest.

Thus, Skill's breach of fiduciary duty claim may proceed on a theory that Palamarchuk breached when he denied Skill a share of performance *profits*, but not on a theory that excluding Skill from performances was breach.

**4.**

Finally, Skill claims that Palamarchuk breached his fiduciary duty by failing to properly defend Master Beat's intellectual property (IP). (ECF No. 34, PageID.935–937.) More specifically, Skill claims that "[u]pon learning of the unauthorized release of Romantics music [on Spotify] and merchandise [on unauthorized websites], Palamarchuk took no action whatsoever." (*Id.* at PageID.946.) But this is not what the record shows. Palamarchuk did act. He contacted the person who apparently

released the unauthorized recording and requested that he take it down. (ECF No. 39-7, PageID.2821–2822; ECF No. 35-1, PageID.1295–1297 (Sealed).)

As to the merchandise, Palamarchuk testified that he was unaware if any unauthorized vendors were selling Romantics merchandise. (ECF No. 35-1, PageID.1300–1306 (Sealed).) While he admitted that he does "not go digging" for unauthorized merchandise sales, he "do[es] the best he can" when he learns of potential IP infringement, (*id.* at PageID.1289–1299, 1305), including assigning others to investigate potential infringement. (*Id.*) That said, Palamarchuk added that the company currently does not "have the assets to do another lawsuit." (*See id.* at PageID.1292.)

In sum, there is no evidence in the record to suggest that Palamarchuk acted willfully or in bad faith by failing to protect The Romantics' intellectual property rights. He testified at his deposition that neither he nor others involved with Master Beat want websites selling unauthorized merchandise to be "up and available." (*Id.* at PageID.1306.) And he has taken some steps to remediate unauthorized merchandise sales, notwithstanding resource constraints. (*See id.* at PageID.1289–1305.) Skill may desire more, but no reasonable jury could find that Palamarchuk's efforts were a breach of his fiduciary duties. Defendants' motions for summary judgment as to this theory are granted.

One final note. Skill pleads unjust enrichment as an "alternative" to his breach of fiduciary count. (ECF No. 1, PageID.31.) Unjust enrichment is an equitable remedy available where there is no enforceable *contract*. *See, e.g.*, *Campbell v. City of Troy*,

202 N.W.2d 547, 549 (Mich Ct. App. 1972). While breach of fiduciary duty is not a contract claim, the relief Skill seeks from both claims is overlapping. And given that the breach of fiduciary claim survives as to the Cash 2 account, Skill's unjust enrichment claim is no longer necessary. If Skill prevails on the breach of fiduciary duty claim, the damages awarded will make him whole for any unjust enrichment claim. And if he does not so prevail, there would be no basis for an unjust enrichment claim given the overlapping nature of the analysis. As such, the unjust enrichment claim is dismissed.

### C. Accounting and Inspection

The Court next turns to Skill's separate but related demands for an accounting and inspection.

#### 1.

"An accounting is an equitable remedy which determines the amount due to a party." *Hedstrom v. Compass Props., LLC*, No. 334305, 2017 Mich. App. LEXIS 2075, at *14 (Mich. Ct. App. Dec. 19, 2017) (citing *Basinger v. Provident Life & Acc. Ins. Co.*, 239 N.W.2d 735, 738–39 (Mich. Ct. App. 1976)). This is an "extraordinary" remedy, available only where "legal remedies are inadequate." *McDonald v. Green Tree Servicing, LLC*, No. 13-12993, 2014 U.S. Dist. LEXIS 40749, at *23 (E.D. Mich. Mar. 27, 2014) (citing *Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th Cir. 1972)). That is, where the complaint seeks only equitable remedies, or where the amount of money damages is uncertain. *Basinger*, 239 N.W.2d at 739–40. "[W]hen discovery could determine the amounts at issue," an accounting is inappropriate. *Miller v.*

*Laidlaw & Co. Ltd.*, No. 11-12086, 2012 U.S. Dist. LEXIS 44392, at *37–38 (E.D. Mich. Mar. 29, 2012) (citing *Basinger*, 239 N.W.2d at 738). Given the "broad discovery available to litigants, accounting actions are of dubious utility." *Gen. Ret. Sys. Of City of Detroit v. Onyx Capital Advisors, LLC*, No. 10-11941, 2011 U.S. Dist. LEXIS 111440, at *38 (E.D. Mich. Sept. 29, 2011) (citing *Digital 2000, Inc. v. Bear Commc'ns, Inc.*, 130 F. App'x 12, 22 (6th Cir. 2005)).

Skill seeks both equitable remedies and money damages, maintaining that the total scope of both are impossible to determine given the complexity of this case. Skill asks the Court not to send this issue to a jury, but to order Master Beat to provide the records he seeks, "within a time period set by the Court." (ECF No. 34, PageID.947.) "Courts sitting in equity have long had the power to conduct an accounting where the complexity of the transactions at issue were such that it would be inconvenient and difficult for a jury to adjust conflicting accounts." *See DiNoto v. NU Way Invs.*, No. 319762, 2015 Mich. App. LEXIS 1069, at *4 (Mich. Ct. App. May 21, 2015) (citing *Basinger*, 239 N.W.2d at 735, 738 ("it is evident that many cases arise in which the determination of what is justly due to a plaintiff necessarily involves long and difficult inquiries—for instance, it may be necessary to review a series of transactions extending over many years. For such an investigation a jury is clearly incompetent")). Skill seeks three categories of information through this demand: (1) information about Palamarchuk's legal fees, (2) corporate credit card statements, and (3) "the flow of funds through accounts to which Skill has been denied access," namely, the Cash 2 account. (ECF No. 34, PageID.940.)

Begin with the legal fee issue. As noted above, there is nothing improper about Master Beat indemnifying Palamarchuk's personal legal fees. Thus, it is not a proper basis for an accounting.

The second category of information sought—corporate credit card information—fares no better. For starters, it seems Skill may already have access to corporate credit card expenditures through the bank statements and transaction logs Defendants have provided. (ECF No. 34-29, PageID.1070 ("[T]he Master Beat bank statements and tour breakdowns already show the tour expenses and American Express credit card payments."); ECF No. 36, PageID.2028 (detailing all the financial documentation Skill obtained during discovery).) To the extent the bank statements Skill received in discovery did not include all the corporate credit card charges, Skill could have, and should have, raised this in discovery. He did not. So the Court will not allow Skill to avail himself of the "extraordinary" accounting remedy to seek credit card statements now. *See Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 618 (E.D. Mich. 2015) (dismissing a demand for accounting from plaintiff's complaint where plaintiff made no claims that the information they needed could not be obtained through discovery).

Finally, Skill seeks records related to the Cash 2 account. (ECF No. 34, PageID.938; ECF No. 44, PageID.3091.) It is undisputed that Skill has not received any financial records related to this account. Defendants say Skill is not entitled to these records because the account is "not in Master Beat's name" and was "not maintained in the ordinary course of business." (ECF No. 34-29, PageID.1068.) But

that is precisely the issue: whether a corporate director can intentionally conceal funds from a 50% shareholder this way?

And contrary to the credit card statement deficiencies noted above, Skill *did* try to obtain these records through discovery. Although Skill did not file a motion to compel, his counsel engaged defense counsel in conversations regarding extending discovery or supplementing their discovery responses. (ECF No. 45-1, PageID.3200.) On at least one occasion, defense counsel indicated to Skill that it would investigate records regarding the Cash 2 account and may provide them as a supplement. (ECF No. 39-4, PageID.2807.) So it is not clear, as Defendants suggest, that Skill's failure to obtain these records through discovery was for lack of trying.

Because Palamarchuk's use of the Cash 2 account is the subject of Skill's surviving breach of fiduciary duty and shareholder oppression claims, the amount of money withdrawn from and returned to Master Beat's accounts is relevant to Skill's damages.

Accordingly, the Court finds that Skill is entitled to an accounting of the Cash 2 account and grants in part his motion for summary judgment as to Count I (and denies Master Beat's motion as to this claim). Within thirty (30) days from entry of this order, Defendants are to produce to Skill all bank records for the Cash 2 account from July 18, 2022, to present.[10]

---

[10] Again, the Court has already narrowed Skill's accounting claim to "information from July 18, 2022" onwards. (ECF No. 16, PageID.776 n.2.)

**2.**

Skill's demand for inspection does not fare as well.

Michigan law provides that shareholders of a corporation "shall have the right . . . to inspect for any proper purpose the corporation's stock ledger, a list of its shareholders, and its other books and records, if the shareholder gives the corporation written demand describing with reasonable particularity his or her purpose and the records he or she desires to inspect, and the records sought are directly connected with the purpose." Mich. Comp. Laws § 450.1487(2).

A "proper purpose" is any "purpose reasonably related to such person's interest as a shareholder." *Id.* But it also "is one that is in good faith, seeks information bearing upon protection of the shareholder's interest and that of other shareholders in the corporation, and is not contrary to the corporation's interests." *N. Oakland Cnty. Bd. of Realtors v. Realcomp, Inc.*, 572 N.W.2d 240, 244 (Mich. Ct. App. 1997). "The distilled version is: a shareholder who has a genuine, good faith interest in the corporation's welfare or [his] own as a shareholder is entitled to inspect those corporate books that bear on [his] concerns." *Hammoud v. Advent Home Med., Inc.*, No. 340502, 2018 Mich. App. LEXIS 389, at *14 (Mich. Ct. App. Feb. 27, 2018).

Master Beat contends that Skill failed to satisfy the statutory requirements. (ECF No. 39, PageID.2770.) This is correct in part. Skill's December 2023 demand letter clearly delineates the categories of documents he seeks, confined to a particular time frame (January 1, 2018, to the date of inspection). (ECF No. 34-13.) But it does not set forth a "reasonably particular" purpose. Instead, it states that Skill is

"obtaining clarity and transparency concerning the company's financial endeavors during the above-referenced time frame, which he has not received as of late, despite holding a fifty percent (50%) interest in the company and having recently sought such clarity from the company on a number of occasions." (ECF No. 35-12 (December 2023 demand letter) (Sealed).) Far from being particular, this is a sweeping demand for open access to all of Master Beat's inner workings.

Michigan courts have analogized the shareholder demand rights in § 450.1487(2) to those of nonprofits under the Nonprofit Corporation Act. *Bafna v. Echo Valley Condo. Ass'n*, No. 353785, 2021 Mich. App. LEXIS 6130, at *12–13 (Mich. Ct. App. Oct. 28, 2021). In that context, a plaintiff's demand letter need not state the purpose of the inspection with perfect clarity. *Bafna v. Brynmawr Condo. Ass'n*, No. 338093, 2018 Mich. App. LEXIS 1703, at *15 (Mich Ct. App. April 19, 2018) (finding that although plaintiffs' requests for inspection were "numerous and longwinded," and written in a "verbose" writing style, they were sufficiently clear and made in good faith). Courts may even look to a combination of plaintiff's complaint, affidavits, or other records, *N. Oakland Cnty. Bd. of Realtors*, 572 N.W.2d at 259, that help narrow and clarify the scope of a plaintiff's inspection request. *See Banfa*, 2021 Mich. App. LEXIS 6130, at *12–13. But there is a point at which a demand becomes too "nonspecific" to be proper. *See id.* at *18; *see also N. Oakland Cnty. Bd. of Realtors*, 572 N.W.2d at 242–43.

In *North Oakland County,* for example, the court suggested that a desire to "monitor the financial health" and "monitor the compliance with [the corporation's]

bylaws" would be "overly broad and nonspecific." *See* 572 N.W.2d at 242–43. Likewise, in *Wolding*, the Sixth Circuit found plaintiff's demand for "access to all company records" so that he "may again become and stay informed" about the company's operations "overbroad." 563 F. App'x at 451–52. Only when made in the context of a recent financial incident have courts tolerated a generic stated purpose of "financial transparency." *See Lennon v. Lennon*, No. 355593, 2022 Mich. App. LEXIS 390, at *2, *11 (Mich. Ct. App. Jan. 20, 2022) (plaintiff's somewhat broad desire to inspect the financial records of a non-profit foundation he once served on the board of was proper given the non-profit's "loss of tax-exempt status" and plaintiff's "uncertainty" with regard to his own tax liability); *see also Hammoud*, 2018 Mich. App. LEXIS 389, at *14–15 (finding a desire to "monitor the financial health of the corporation, especially given recent . . . financial decisions reducing benefits and payments to shareholders and employees" was a proper purpose).

Both parties moved for summary judgment. They agree the facts are undisputed. Because the law supports that Skill's request for inspection is too broad, his motion for summary judgment on Count II is denied and Master Beat's motion on this claim is granted. (ECF No. 36, PageID.2026.)

### V. Additional Arguments

Next the Court turns to the additional counts asserted by Skill for which Defendants alone seek summary judgment: breach of contract, conversion, the right of publicity/false designation, as well as dissolution of Master Beat.

### A. Breach of Contract

Palamarchuk moves for summary judgment on Skill's claim that he breached the parties' original 1984 shareholder agreement. (ECF No. 37, PageID.2148–2149.) In Palamarchuk's view, that 1984 contract was rendered obsolete by the exit of Canler and Marinos from Master Beat and has been abandoned since. (*Id.* at PageID.2166.)

A contract is deemed abandoned (and thus void) when one party acts in a manner inconsistent with the contractual terms and the other party acquiesces. *Dault v. Schulte*, 187 N.W.2d 914, 915 (Mich. 1971); *Gerald L. Pollack & Assocs. v. Pollack*, Nos. 319180/320917/320918/320919, 2015 Mich. App. LEXIS 153, at *38 (Mich. Ct. App. Jan. 27, 2015); *Haworth Inc. v. Shape Corp.*, No. 354046, 2021 Mich. App. LEXIS 5158, at *12 (Mich. Ct. App. Aug. 26, 2021) (explaining that an abandoned contract is considered rescinded, and a rescinded contract is "in effect, considered to have never existed"). Accordingly, "abandonment of a contract need not be express but may be inferred from the conduct of the parties and the attendant circumstances." *Dault*, 187 N.W.2d at 915 (citing 17A Am. Jur. 2d Contracts § 484).

On the record before the Court, it may be inferred that the parties abandoned the 1984 shareholder agreement. First, compliance with the agreement after Canler and Marinos' departures would have been impossible, as the agreement required the approval of more shareholders or officers than the company had. (ECF No. 1-1, PageID.39.) And it also required a four-member board of directors. (*Id.* at PageID.38.) As Palamarchuk testified, "I don't see how [the shareholder agreement] could be

valid. There's four people listed on there. There's only two people in Master Beat now." (ECF No. 35-1, PageID.1153 (Sealed).)

The record also reveals acquiescence. Both Skill and Palamarchuk testified to doing things that plainly defy the terms of the original agreement. Skill testified to serving as "Secretary-Treasurer" where the agreement indicates those would be separate positions. (*See* ECF No. 37-3, PageID.2210.) When action needed to be taken for the company, far from the formal vote process outlined by the agreement, Skill described an "ambiguous" process of talking with Palamarchuk and working issues out as they arose:

> Q: . . . when I asked you what your duties were, you said if there was anything that would come up if Wally requested that you would participate in, should I take from that that sort of in the normal day-to-day stuff that came up associated with Master Beat that Wally would handle that in the first instance and then reach out to you as required?
>
> A: Was more ambiguous that than.[sic] Sometimes I would-- sometimes I wouldn't get involved or he wouldn't involve me and sometimes, very rarely, I was involved.

(*Id.* at PageID.2211.)

Palamarchuk likewise testified:

> [b]etween the two [of] us we would—like I say, we've been in court for ten years straight. We would see each other there. We would talk when we could on the phone. Either that or emails or whatnot. If we needed something done, we would find a way to get it done.

(ECF No. 35-1, PageID.1168 (Sealed).) As further evidence that the 1984 agreement had been mutually abandoned, Palamarchuk explained that in or around 2011, Master Beat had about $32,000 in debts (*id.* at PageID.1187), notwithstanding that the 1984 agreement required the approval of two shareholders before incurring any

liabilities beyond $2,500, and Skill admits he was rarely involved in day-to-day decisions.

In response, Skill merely offers that the 2011 board resolution "reflects an affirmative operational modification of the Shareholder Agreement's distribution practices, not wholesale abandonment." (ECF No. 42, PageID.3021.) But the record suggests not even that agreement was enforced. (ECF No. 35-4 (Sealed).) And as part of his breach of fiduciary duty claim, Skill contends that Palamarchuk neglected their former counsel's 2018 advice to "formalize a process for effectively resolving" disagreements. (ECF No. 34, PageID.926 (citing ECF No. 35-4 (Sealed)).) The necessary inference of this claim is that in 2018, the parties did not have a "formal process" for resolving agreements. In other words, the 1984 shareholder agreement was no longer in effect.

In short, there is no genuine dispute of material fact that the 1984 shareholder agreement was long abandoned. Thus, Palamarchuk's motion for summary judgment on Count V is granted.

**B. Right of Publicity and False Designation Under the Lanham Act**

Next, Skill alleges two separate but related claims. First, he argues that Palamarchuk used Skill's "likeness, name, and identity" without permission and that this use "constitutes an invasion of Skill's right of publicity." (ECF No. 1, Page.29.) And second, he brings a false designation of origin claim under the Lanham Act, 15 U.S.C. § 1125(a), alleging that Palamarchuk used Skill's "likeness, name, and identity in advertising Palamarchuk's live performances which do not feature Skill."

(*Id.* at PageID.30.) Both derive from one instance: Palamarchuk's alleged use of "Skill's image to promote the Cherokee Fall Festival." (ECF No. 42, PageID.3024; *see also* ECF No. 1, PageID.17.)

The right of publicity protects a plaintiff's "pecuniary interest in the commercial exploitation of his identity." *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir. 1983). To prevail on a right of publicity claim, Skill must prove (1) that he has a pecuniary interest or significant commercial value in his identity and (2) that Defendants engaged in commercial exploitation of his identity. *Arnold v. Treadwell*, No. 283093, 2009 Mich. App. LEXIS 1536, at *13 (Mich. Ct. App. July 16, 2009) (citing *Hauf v. Life Extension Found.*, 547 F. Supp. 2d 771, 777–78 (W.D. Mich. 2008)).

The Lanham Act similarly imposes liability on "any person who, on or in connection with any goods or services . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A). While the elements of a Lanham Act false designation claim differ from a common law right of publicity claim, *see, e.g.*, *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998) (describing elements of false designation), a necessary prerequisite to both claims is that the *defendant* must have been the party who engaged in the alleged unlawful conduct, i.e., the defendant must have exploited the plaintiff's likeness or made a false designation related to the plaintiff in commerce.

Skill has not made this threshold showing. Palamarchuk does not dispute that Skill, as a celebrity, has a pecuniary interest in his identity. (ECF No. 37, PageID.2167–2168.) Nor does he dispute that Skill's image was used, without his approval, to promote the Cherokee Fall Festival. (*Id.* at PageID.2168.) But he is not the one who used the image. Palamarchuk contends that it was third-party marketers for the event, who, without his knowledge, used Skill's image. (*Id.*) And in his telling, once he discovered the concert was being promoted with an image including Skill, Palamarchuk asked the venue to correct it. (ECF No. 37-19, PageID.2751.)

Skill presents no evidence to the contrary. In his response brief he argues that "[a]t a minimum, the record permits a jury to find that the Cherokee Festival advertising commercially exploited Skill's identity to drive ticket sales and goodwill for Defendants." (ECF No. 42, PageID.3024 (emphasis added).) But he provides no basis for finding Palamarchuk responsible for the Cherokee Festival advertising. Nor does Skill provide any evidence that Palamarchuk otherwise "exploited" his image. He just assumes it. (*See* ECF No. 42, PageID.3024 ("Given the [unspecified] record evidence, a reasonable jury could find that Defendants' [unspecified] conduct likely caused confusion as to Skill's endorsement and affiliation with this performance").) This is not evidence that creates a fact issue for a jury.

For these reasons, Palamarchuk's motion for summary judgment as to Counts VI and VII is granted.

### C. Conversion

"In Michigan, the tort of conversion has bases in both statutory and common law." *In re B & P Baird Holdings, Inc.*, 759 F. App'x 468, 474 (6th Cir. 2019). "Both types of conversion require a 'distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.'" *In re Romanzi*, 31 F.4th 367, 381 (6th Cir. 2022) (quoting *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 141 (Mich. 2015)). "When that property is money, 'the defendant [(1)] must have obtained the money without the owner's consent [(2)] to the creation of a debtor-creditor relationship and [(3)] must have had an obligation to return the specific money entrusted to his care.'" *Id.* (quoting *Bastin by Bastin v. Welch*, No. 351652, 2021 WL 2025148, at *4 (Mich. Ct. App. May 20, 2021)).

Skill's conversion claim, like his other claims, is based on (1) Master Beat's loan repayment to Palamarchuk, (2) Master Beat's payment of Palamarchuk's legal fees, and (3) Defendants' failure to credit the prejudgment garnishment of his royalties against the state court judgment. (ECF No. 42, PageID.3013.) The Court has already addressed these arguments. For the reasons already stated, the indemnification of Palamarchuk's legal fees was not improper. Nor was it Skill's money nor did it create a debtor-creditor relationship between Skill and Palamarchuk. Thus, it cannot be the basis of a conversion claim. Likewise, res judicata precludes Skill from re-arguing the garnishment issue under a conversion theory.

That leaves the loan repayment. Skill offers no evidence that the money Master Beat used to repay Palamarchuk belonged to Skill. *See Nedschroef Detroit Corp. v. Bemas Enters. LLC*, 106 F. Supp. 3d 874, 886 (E.D. Mich. 2015) (explaining that common law conversion "is established by showing 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein'") (citation omitted). So this claim is likewise unsuccessful.

Accordingly, Palamarchuk's motion for summary judgment on Count IX is granted.

## VI.

For many years, Skill and Palamarchuk were in harmony, both on and off the stage. But no more. While years of contentious litigation has only deepened the wounds, there is more to come. Although many of the claims being asserted in this case have now been disposed of on summary judgment, a few others need to be resolved by a jury. Those are: (1) Skill's shareholder oppression claim and (2) Skill's breach of fiduciary duty claim based on Defendants' alleged failure to provide material financial information.

Additionally, for the reasons described above, the Court grants summary judgment, in part, in Skill's favor as to the demand for an accounting. Within thirty (30) days of entry of this order, Defendants are to produce all financial records in their possession, custody, or control regarding the Cash 2 account to Skill. Palamarchuk's motion for summary judgment on the conversion claim (ECF No. 37) is granted.

Summary judgment is also granted to Defendants on Skill's demand for inspection and breach of contract, right of publicity, Lanham Act false designation, and conversion claims.

IT IS SO ORDERED.

Dated: September 30, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE